**2018 UT App 5**

## THE UTAH COURT OF APPEALS

K.P.S.,
Appellee,
*v.*
E.J.P.,
Appellant.

Opinion
No. 20160164-CA
Filed January 5, 2018

Third District Court, Salt Lake Department
The Honorable Paul G. Maughan
No. 034906783

Virginia L. Sudbury and Alison Satterlee, Attorneys
for Appellant

Asa E. Kelley, Attorney for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN concurred.

TOOMEY, Judge:

¶1      E.J.P. (Father) appeals the district court's award of sole
physical custody of their child (Child) to K.P.S. (Mother),
contending the district court failed to provide sufficient findings
of fact to support its decision and failed to articulate the reasons
for its decision not to follow the recommendation of the
Guardian ad Litem (the GAL) that Father be awarded primary
physical custody of Child. Father also asks this court to remand
for a ruling on the remaining issues that were certified for trial
but were not ruled upon. We agree with Father and vacate the
district court's award of sole physical custody to Mother and
remand for further proceedings on this issue, as well as the
issues that the district court failed to address.

BACKGROUND

¶2    Mother petitioned for a divorce from Father in 2003, after almost two years of marriage. Shortly thereafter, they stipulated to a mutual restraining order, which prohibited communication between them that did not involve Child, and agreed Mother would have temporary legal and physical custody of Child, who was less than two years old at the time. Mother was also permitted to move to Idaho with Child, where she and Child have resided since 2003. Father, who remained in Salt Lake City, Utah, was awarded parent-time. In 2005, the district court entered a bifurcated decree of divorce, leaving the issues of child custody, child support, spousal support, marital debts, and marital property for further adjudication.

¶3    Since the divorce, Mother and Father's relationship has been hostile. Testimony at trial demonstrated that parent-time exchanges were often tense. And in 2005 and 2007, Mother accused Father of abusing Child and reported the allegations to the Division of Child and Family Services (DCFS). DCFS initiated investigations into the allegations, which led the court to order supervision during Father's parent-time with Child. In 2011, Father successfully petitioned DCFS to review the abuse allegations against him. Thereafter, DCFS changed its findings from "supported" to "unsupported."[1] In 2013, Father petitioned

---

1. Utah Code section 62A-4a-101(45) defines "unsupported" as "a finding at the completion of an investigation that there is insufficient evidence to conclude that abuse, neglect, or dependency occurred." Utah Code Ann. § 62A-4a-101(45) (LexisNexis Supp. 2017). But "a finding of unsupported means also that the division worker did not conclude that the allegation was without merit." *Id.* An allegation of abuse is "without merit" when DCFS finds that the alleged abuse "did not occur, or that

(continued…)

the district court to amend the bifurcated decree of divorce to remove the supervised parent-time provision, but that provision was not removed until after a 2015 mediation.

¶4     While in Mother's care, Child became severely depressed, sparking a pattern of self-harming behavior, most of which went unnoticed, including at least one of two suicide attempts. And when Mother was apprised of this behavior, her concern did not rise to the level that would be expected. During one of Child's stays with Father, he believed she was having an allergic reaction of some sort and took her to the emergency room for treatment. Because Child did not respond to treatment, the physician directed a social worker to observe Child to determine whether the reaction was "anxiety related." The social worker asked Child if "she had ever had thoughts of self-harm," and Child disclosed that, when she was ten years old, she had taken a bottle of sleeping pills at Mother's house "because she just wanted to die." Mother did not know that Child had attempted suicide until Father informed her of it. Child also told the social worker that she had attempted suicide a second time at the age of twelve, this time by cutting her wrists with knives from Mother's kitchen.[2] The knives were not sharp enough to cause fatal wounds, but they did physically injure her.

¶5     At the time of trial, Child had continued to engage in self-harming behavior while in Mother's care, including using razor blades to cut her forearms and hips. When asked if Child engaged in this type of behavior while in Father's care, Father

_____

(…continued)
the alleged perpetrator was not responsible for the abuse." *Id.* § 62A-4a-101(46).

2. Because she was not asked about this event at trial, it is unclear whether Mother was aware of this second attempt.

testified it was very unlikely because when she arrived at his house Child gave him the razor blade and discussed with him what had "bother[ed] her."

¶6   At trial, Mother downplayed Child's first suicide attempt. She testified that the pills Child ingested were merely melatonin and that melatonin is "a natural herbal sleep aid," so "they don't hurt ya." When asked about this again, Mother testified, that she did not know exactly what Child ingested in an attempt to end her life but stated, "I know that if you take one melatonin pill, it won't harm you. I don't know how many she took . . . . I don't know if [taking a full bottle] would or would not" have harmed Child.

¶7   Father, on the other hand, took the news of Child's attempted suicide seriously and found her an Idaho therapist (Therapist) with an office thirty minutes away from Mother's house. Father testified that, even when Child stayed with him in Salt Lake City, he drove her to therapy appointments in Idaho. Father and Child also filled out a "suicide prevention" plan that included the names of people to call if Child had suicidal ideations and identified other steps to take to prevent her from harming herself. Father added that he was concerned that Mother continued to not allow Child to take the medication prescribed to treat her depression.

¶8   One incident, dubbed by Mother's attorney as "the ice cream event," received the most attention at trial. Mother testified that, before one of Child's therapy appointments, Mother "could tell [Child] was just dragging that morning. It was hard to get her up and ready for the [appointment]." Once there, Child told Therapist that she was having suicidal ideations. Mother testified that, based on this, Therapist "[v]ery strongly" recommended that Mother immediately take Child to the nearest emergency room, and Therapist had notified the hospital's psychiatric unit that Child would be arriving shortly.

Therapist also contacted Father to alert him to Child's suicidal thoughts. Concerned, Father tried contacting Mother, but after numerous unanswered phone calls, spoke directly to Child, who informed him that, rather than going to the emergency room, Mother was taking her and her half-siblings out to swim and get ice cream.

¶9    On cross-examination, Mother was asked whether she took Child's "threats and attempts to kill herself seriously." Mother responded, "Of course," but also stated she "made a decision" not to follow through with Therapist's recommendation to take Child to the emergency room on that particular occasion. While Mother and Therapist talked, Child was having fun with her half-siblings in the waiting room. Mother then clarified that she had still planned to take Child to the emergency room and added, "But surely [I could] take her to get ice cream first, you know, before [going] to the psychiatric center." Mother also testified she could not have taken her two younger children to the emergency room with Child and instead decided to take all of them swimming, because "it just turned out to be a good day for it" and "as a family . . . we don't get to do it very much." Mother testified that Child appeared "happy" and "overjoyed" after swimming and eating dinner with the family and told Mother she felt much better.

¶10    Father testified that if Child ever expressed suicidal ideations while staying with him, "There wouldn't even be a hesitation, she would be back up in the emergency room."[3]

---

3. At trial, Father testified about Child's other medical issues and his concern that Mother had failed to address them appropriately. We focus on the most serious challenges Child faced without minimizing these other issues.

¶11 Child's educational needs were also addressed during trial. Both parties agreed that Child is intelligent and had always been "very articulate" and independent. Father testified he had communicated with Child's teachers in Idaho and had been informed that "they really can't challenge Child. She gets bored." Father testified he "has to put pressure on her to pull her grades back up because she gets bored and doesn't [participate]." The teachers recommended that Father look into an online school "while she's in Idaho to challenge her." Father described Child's academic and career aspirations and the plan Father had helped her create to realize those goals. Father testified that, if Child lived with him, she would be "guaranteed a seat" at a public charter school[4] that offered numerous advanced placement courses in languages, history, English, math, science, and more. The charter-school students also had the opportunity to take courses for college credit at the University of Utah. Based on Child's long-term academic and career goals, Father wanted Child to have the opportunity to prepare for college.

¶12 Mother did not testify that she conversed with Child's teachers about her status as a student. When asked about the courses Child would "be exposed to" if she continued to attend school in Idaho, Mother responded, "Generally just whatever is required by law in the public school system. Um, also I have . . . some pamphlets on an accelerated program where she can receive college credits and graduate early." But Mother could not identify the courses offered or the requirements of the accelerated programs that would allow Child to graduate early.

---

4. Though the school used a "lottery system" for accepting students, Child qualified for the "sibling exemption," because Child's older sister had just graduated from the school.

¶13    Each parent was asked to explain why he or she should be awarded custody of Child. Mother testified she should maintain sole physical custody because she loved Child, has had sole custody of Child for the majority of Child's life, and was concerned Father would not facilitate the statutorily required parent-time with her. Mother did not explain the basis for this concern.[5] Father testified that he should have primary physical custody because he would help make Child's life better. He wanted to ensure that her mental health stabilizes and that she would be given the opportunity to succeed academically and pursue her goals.

¶14    The GAL made a detailed oral recommendation to the court. She determined it would be in Child's best interest to award Father primary physical custody. She spent a significant amount of time addressing her concerns about Mother's responses, or lack thereof, to Child's mental health issues and repeatedly stated that it was not in Child's best interest for Mother to maintain sole physical custody. She emphasized her concerns about Mother's pattern of "minimiz[ing] the seriousness" of Child's health, suicide attempts, suicidal ideations, and self-harming behavior. She noted that Mother's refusal to allow Child to take prescribed medication and her refusal to take Child to the emergency room after Therapist told her that Child was suicidal not only minimized the seriousness of Child's mental health condition but was also an attempt to distance herself from acknowledging that she contributed to

---

5. Indeed, the record shows that, on numerous occasions, Mother either made excuses not to facilitate parent-time with Father or "blatantly refuse[d]." Mother also repeatedly prolonged proceedings related to parent-time and custody issues and was therefore required to pay Father's attorney fees for causing the delays.

Child's condition. The GAL concluded that Mother's behavior was "dangerous for [Child]."

¶15 The GAL also highlighted Mother's initial retort that the bottle of sleeping pills Child took in her first suicide attempt "was 'only melatonin' and 'couldn't have hurt her,'" but then later forgot exactly what substance Child took in an attempt to end her life. The GAL also recounted the "ice cream event" and discussed her concern that Mother would allow Child, who was thirteen at the time, to dictate whether Mother should follow Therapist's recommendation to go to the emergency room. Child told the GAL that she feels "ignored and not taken seriously" by Mother. The GAL noted that, "concerning the medical issues . . . and her depression alone," she could "understand where [Child] doesn't feel that her needs are being taken seriously" by Mother. The GAL commented that "sometimes we might all identify as being [a] lazy [parent]. We didn't bathe the kids one night [or] help them pick up their rooms," but noted that there is a difference between "a lazy parent and one who . . . minimizes the care their child needs."

¶16 In contrast, the GAL stated that Father immediately responded to Child's medical needs. The GAL said that Child felt "she can approach [Father] with anything," she feels "loved and cared for" by Father, and that they both followed the suicide prevention plan she and Father established for her ideations, which "gives her a sense of security." The GAL recommended that Father be awarded primary physical custody of Child because Father took appropriate actions to address her needs.

¶17 The district court asked the GAL to "be more specific" about why the recommendation was in Child's best interest because, as the court explained, "[W]e don't let children make decisions. They're not capable of making decisions. . . . We don't do what children want, because it's not in their best interest."

¶18    The GAL responded, "I agree. We don't let children make decisions . . . of this significance," and continued, "But we also don't let children override what a therapist has recommended to a mother so that she could just . . . have fun. Which [is what] Mother said." The GAL reiterated her concerns about Mother not providing the medical care that Child needed to treat her depression, suicidal ideations, and self-harm. She also reiterated that Father had "taken steps to address [Child's] issues" and had done so "in an appropriate way." The GAL stressed that Child needed "a parent who opens his or her eyes as to how significant these issues are" and "who takes the appropriate steps to address these issues." In addition, the GAL determined it would be "very beneficial" for Child to attend the charter school because Mother, Father, and Therapist recognize she is "very intelligent for her age." For all of those reasons, the GAL concluded it was "in Child's best interest" to live with Father.

¶19    Although the district court acknowledged that "[i]t is troubling . . . that [Mother] has not done more than she has to address [the issues] with [Child]," the court nevertheless awarded Mother sole physical custody. It ordered her "to follow through with the recommendations of [Therapist] . . . to obtain an evaluation of [Child] and abide[] by those recommendations, including, that if medication is prescribed, then medication needs to be given to [Child]. Therapy is to continue and the recommendations given by [Therapist] are to be followed." The court later emphasized "that therapy for [Child] is to continue as long as [Therapist] believes it to be wise and appropriate and that [Mother] is to comply with any treatment or counseling program provided for [Child]." The court also commented that it "does not minimize [Mother's] failure to follow through with [the] medical needs of [Child]." And "although [Mother] did not take [Child] to the [emergency room], she is still attending consistent and ongoing therapy, which is a minimum standard of care."

¶20    In explaining its reason for disregarding the GAL's recommendation, the district court said,

> The Court finds the Guardian ad Litem has done a very wonderful, competent, professional job in providing her recommendation to the Court. However, based on the Court's experience, both in criminal court in dealing with child victims and in this Court with hundreds of domestic actions dealing with minors, the Court is not persuaded that a thirteen (13) year old is capable of having meaningful input to have her expressed interest given much creditability and much weight by this Court. The Legislature has recently changed that age from sixteen (16) to fourteen (14), but thirteen (13) is still not fourteen (14).[6]

The court did not find that it was in Child's best interest for Father to be awarded primary physical custody because Father was "strong willed," had poor temperament, did not exercise enough parent-time "over the length of this matter," and required supervised parent-time. The district court also stated that it would not consider Child's education as a factor "unless everything else was equal . . . especially in consideration of

---

6. The court appears to be referencing Utah Code section 30-3-10(1)(e), which provides that a court may "inquire of a child and take into consideration the child's desires regarding future custody or parent-time schedules" and that the "desires of a child 14 years of age or older shall be given added weight." Effective May 14, 2013, the legislature amended this section and substituted "14 years" for "16 years" for those children whose desires are to be given "added weight." *See* Utah Code Ann. § 30-3-10(1)(e) (LexisNexis Supp. 2017).

[Mother's] statement that they do have an advanced placement program in the Idaho schools."[7]

¶21 In awarding Mother sole physical custody, the district court determined it "[was] not going to equalize parent time, due to the distance between households" and awarded Father only "minimum statutory parent time" of "110 overnights."

¶22 Numerous issues were certified for trial, including legal and physical custody, parent-time, a parenting plan, child support, arrears on medical expenses, and reallocation of the custody evaluator's fees. Although most of the testimony focused on custody, the parties provided evidence, either through testimony or exhibits, that related to the parties' respective income, Child's medical expenses, orders by the court to award Father reasonable attorney fees, and allocation of the custody evaluator's fees. The court did not address any of these issues.

¶23 Father appeals the district court's order awarding Mother sole physical custody of Child and the court's failure to rule on all issues certified for trial.

## ISSUES AND STANDARDS OF REVIEW

¶24 First, Father contends the district court "did not make sufficient findings of fact" related to the custody issue when it

---

7. In its oral ruling, the district court judge stated, "I met last summer a girl from China that grew up with nothing. She started at nine years old making funeral cards by putting the tin foil on the card. And last year graduated from Kennedy School of Management." The final order, drafted by Mother's attorney, put it this way: "people from all over from all different areas and schooling find their way to higher education and do well."

failed to "disclose the steps by which the ultimate conclusion on each factual issue was reached" and failed to explain its departure from the GAL's recommendation that Father be awarded primary physical custody of Child. We review a challenge to the district court's findings of fact for clear error. *See Nicholson v. Nicholson*, 2017 UT App 155, ¶ 5, 405 P.3d 749. "We review custody determinations under an abuse of discretion standard, giving the [district] court 'broad discretion' to make custody awards." *Cook v. Cook*, 2013 UT App 57, ¶ 5, 298 P.3d 700 (citation and internal quotation marks omitted).

¶25 Second, Father contends the district court "did not rule on all issues certified for and presented at trial." "It is the duty of the trial court to find upon all material issues raised by the pleadings, and the failure to do so is reversible error." *Vandermeide v. Young*, 2013 UT App 31, ¶ 8, 296 P.3d 787 (citation and internal quotation marks omitted); *see also* Utah R. Civ. P. 52(a)(1) ("In all actions tried upon the facts without a jury . . . the court must find the facts specially and state separately its conclusions of law. The findings and conclusions must be made part of the record[.]").

ANALYSIS

I. The District Court's Insufficient Findings of Fact

¶26 Father contends the district court failed to make sufficient findings of fact to support its award of sole physical custody to Mother and failed to articulate the reasons for its departure from the GAL's recommendation. We agree.

¶27 The district court's "findings of fact must show that the court's judgment or decree follows logically from, and is supported by, the evidence." *Andrus v. Andrus*, 2007 UT App 291, ¶ 17, 169 P.3d 754 (citation and internal quotation marks omitted). The findings of fact must be "sufficiently detailed and

include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Id.* (citation and internal quotation marks omitted). Whenever custody is contested, the district court must provide the necessary supporting factual findings that link the evidence presented at trial to the child's best interest and the ability of each parent to meet the child's needs. *See Sukin v. Sukin*, 842 P.2d 922, 925 (Utah Ct. App. 1992); s*ee also* Utah Code Ann. § 30-3-10(1)(a) (LexisNexis Supp. 2017) (providing that in custody proceedings a district court "shall consider the best interests of the child without preference for either parent" through the consideration of several enumerated factors). "[F]ailure to provide adequate findings is reversible error when the facts are not clear from the record." *Bartlett v. Bartlett*, 2015 UT App 2, ¶ 2, 342 P.3d 296 (citation and internal quotation marks omitted).

¶28   In *Bartlett*, a father challenged the district court's award of primary physical custody to the mother, arguing that the court's findings of fact lacked sufficient detail and "fail[ed] to disclose the rationale" for its conclusion. *Id.* After awarding the mother primary physical custody, but before the findings of fact were entered, the father informed the district court at a review hearing that, among other things, the mother had withheld parent-time in violation of the schedule set at trial. *Id.* ¶ 4. The district court admonished the mother for this behavior and "reminded her that she needed to obey the court-ordered visitation schedule." *Id.* The district court entered findings of fact and conclusions of law and awarded the mother primary physical custody. *Id.* ¶ 5. It described "the status of the parties in some detail," summarized the "conclusions of the custody evaluator and other experts," and concluded that both parties were fit parents. *Id.* The court indicated that the parties were "'evenly balanced'" in all respects but concluded that the mother was "'better able and equipped to support and sustain a positive relationship between [the children] and their father'" and that the father had "'not shown a similar propensity.'" *Id.* (alteration in original).

¶29 On appeal, this court acknowledged that the district court "admirably detailed" the findings of fact but concluded that the findings failed to "disclose the steps by which the court reached its decision to award custody to [the mother]." *Id.* ¶ 6. This court explained that the "custody award [depended upon] the factual conclusion" that the mother was "'better able and equipped to support and sustain a positive relationship between the [children] and their father,'" but the district court "identified no subsidiary facts supporting this finding." *Id.* (second alteration in original). This was "a striking omission in light of the fact that the court had recently admonished [the mother] for denying [the father] court-ordered access to the children." *Id.* The custody award was vacated and the case remanded "for further proceedings, including supplementation of the court's findings and reconsideration of the custody award in light of those supplemental findings." *Id.* ¶ 8.

¶30 Here, as in *Bartlett*, the district court detailed the status of the parties and made factual conclusions but failed to provide subsidiary facts to support any of its findings or conclusions. And "the basis for the custody award [is not] clear from the record." *Id.* ¶ 7. The court based its custody award, in part, on three factual determinations it made against Father.

¶31 First, the court found Father did not exercise enough parent-time, but it did not discuss the number of times Father failed to exercise parent-time or explain why the number of times he did exercise parent-time was deficient. The court ignored the many obstacles Father encountered in exercising parent-time. For example, Mother lived three hours away from Father and withheld parent-time on several occasions. The court also appears to have ignored the significant efforts Father made. For example, Father not only paid for gas and hotel rooms for his parent-time in Idaho but also paid for Mother and her other children to participate in activities with Father, Child, and Father's family. Much like the *Bartlett* court, we deem the district

court's failure to provide subsidiary facts supporting this finding to be a "striking omission." This is especially so, given that the district court stated in its findings of fact that it questioned the accuracy of Mother's testimony that she made up the parent-time that she initially precluded Father from exercising.[8]

¶32 Second, the district court stated that Father was "strong willed" and that it was "troubled in part by that characteristic," but it did not provide subsidiary facts to support its finding. Moreover, the court did not explain what it meant by "strong-willed" or why this characteristic should be treated as adversely

---

8. Overall, the way the district court articulated this finding is concerning, because it is not coherent:

> The Court finds that based on the evidence presented, that much was made of a period over one-year from January to June that parent time did not take place, and that [Mother] testified that she made up the time. The Court questions the accuracy of [Mother's] testimony but the Court does find that [Mother] facilitated visitation on a much more regular basis than [Father] exercised his right to parent time during that period of time. Testimony was that there was as much as eight (8) times, but whether it was double that, it is still not within the realm of facilitating or exercising parent time on a meaningful basis.

We are perplexed, given the court's phrasing, as to whether Mother withheld parent-time eight or sixteen times, whether Father exercised parent-time eight or sixteen times, or whether Father missed parent-time eight or sixteen times. We are unable to determine from the court's findings how many parent-time opportunities there should have been between January and June of an unknown year.

impacting Child.[9] Relatedly, the court took issue with Father's temperament but made only one vague reference to it.

¶33 Third, the district court found that, because Father was required to have his parent-time supervised for a number of years during the course of the proceedings, it was not in Child's best interest to live with Father. The court failed to discuss the nature of the conduct that prompted the imposition of supervised parent-time, or the important fact that Father successfully petitioned DCFS to review the allegations and change its findings to "unsupported." This change made by DCFS meant that there was "insufficient evidence to conclude" that the alleged abuse occurred. *See* Utah Code Ann. § 62A-4a-101(45) (LexisNexis Supp. 2017). Indeed, Father's parent-time would not have been supervised if DCFS had made the correct determination in the first instance.

¶34 The district court also rejected the GAL's recommendation. Although it is not bound to accept such a recommendation if it is not well-founded, the court failed to articulate a legitimate reason for its rejection that was comparable to the GAL's substantial, factually supported concerns. *See R.B. v. L.B.*, 2014 UT App 270, ¶ 18, 339 P.3d 137 ("Although a district court is not bound to accept a custody

---

9. From the record, it appears that Father's "strong will" was reflected in a determination to do what was best for Child as evidenced by, among other things, his arranging for a therapist in Idaho, conferring with Child's teachers in Idaho, and addressing Child's other health-related needs after discovering Mother had not taken appropriate action. In short, Father's "strong will" in advocating for Child seems to be a positive. If there were aspects of his "strong will" that affected Child negatively, they were not identified by the court and are not obvious on the record before us.

evaluator's recommendation, the court is expected to articulate some reason for rejecting that recommendation"); *cf. Tuckey v. Tuckey*, 649 P.2d 88, 91 (Utah 1982) ("[A]lthough the [district] court was not bound to accept the evaluation of the Department of Social Services, the court indicated no reason for totally dismissing the report submitted under court order."). The district court complimented the GAL's work, but focused on what it erroneously characterized as the GAL's reliance on Child's preference.[10] It noted that Child was only thirteen years old and added, "The Legislature had recently changed that age from sixteen (16) to fourteen (14), but thirteen (13) is still not fourteen (14)."

---

10. This factual conclusion implies that the GAL based her recommendation entirely on Child's "expressed interest" in living with Father. But the GAL provided many reasons in support of her recommendation beyond conveying Child's preference. *See infra* ¶¶ 14–17. When a child is the subject of litigation, a guardian ad litem is appointed by the court to represent the interests of the child. Utah Code Ann. § 78A-6-902(8)(a) (LexisNexis 2012). A guardian ad litem has the statutory responsibility to investigate "the situation and needs of the minor," *id.* § 78A-6-902(3)(c), and will make recommendations to the court based on that investigation and its determination of the best interest of the child, *see id.* § 78A-6-902(8)(a)–(d). A guardian ad litem is not required to conform its recommendation with the "minor's wishes," and if "the minor's wishes differ from the [guardian ad litem's] determination of the minor's best interest," the guardian ad litem is required to communicate the minor's wishes to the court as well as its own determination of the child's best interest. *See id.* § 78A-6-902(8)(b). The only time that a guardian ad litem is not required to communicate the child's wishes to the court is where the child instructs the guardian ad litem not to do so or if the child "has not expressed any wishes." *Id.* § 78A-6-902(8)(d).

¶35    The district court was mistaken. The statutory provision relevant to custody under the Utah Code provides that "[t]he court may inquire of a child and take into consideration the child's desires regarding future custody or parent-time schedules, but the expressed desires are not controlling and the court may determine the child's custody or parent-time otherwise." Utah Code Ann. § 30-3-10(1)(e) (LexisNexis Supp. 2017). That subsection also provides that the "desires of a child 14 years of age or older shall be given *added* weight, but it is not the single controlling factor." *Id.* (emphasis added.) And we have previously noted that "a child's preference concerning custody decisions is not binding on the court and must be weighed according to the age and maturity of the child expressing the preference." *Larson v. Larson*, 888 P.2d 719, 725 n.8 (Utah Ct. App. 1994) (citing an earlier version of Utah Code section 30-3-10(1)).

¶36    The GAL articulated several concerns regarding Mother's ability to provide necessary care for Child. She focused heavily on Mother's minimization of Child's medical needs. Specifically, she was concerned that Mother had a pattern of "minimizing . . . the seriousness" of Child's suicide attempts, ideations, and self-harming behavior. She supported this by describing Mother's dismissal of Child's first suicide attempt. The GAL also discussed the "ice cream event" and said that she saw this as Mother not only minimizing the medical attention Child needed but also disregarding the "seriousness of [Therapist's] direction and recommendation of what Mother should do" when Child has a suicidal ideation. And the GAL was concerned that Mother does not allow Child to take the medication prescribed for her depression.

¶37    The GAL also provided numerous reasons supporting her determination that it was in Child's best interest for the court to award Father primary physical custody. She explained that, when it comes to Child's needs, she has seen "that Father has

taken steps to address the issues that Child brings to him . . . in an appropriate way." She recounted that: (1) Father took Child to the emergency room immediately after discovering she was having a suicidal ideation; (2) Father looked for a therapist near Mother's house and found Therapist; (3) Father has taken Child to her therapy appointments in Idaho during his parent-time in Salt Lake City; (4) Father helped Child fill out the "suicide prevention" plan and discusses it with her during his parent-time and that this "gives her a sense of security"; and (5) Father showed at trial that he understands Child's academic and career goals and has a plan for helping her to realize those goals.

¶38    And, as required by the Utah Code, the GAL informed the court of Child's desire to live with Father. She explained that her observations of Child, and discussions with Child's relatives and Therapist, led her to conclude that Child "is intelligent," "conversant," and "articulate." This information offered the district court a basis for determining how much weight Child's desires should be given in conjunction with other evidence. *See Larson*, 888 P.2d at 725 n.8.

¶39    The district court was "not bound to accept" the GAL's recommendation, but, as with its duty regarding the findings of fact, "the court [was] expected to articulate some reason for rejecting that recommendation." *R.B. v. L.B.*, 2014 UT App 270, ¶ 18, 339 P.3d 137. This is especially true in a case like this, where the recommendation is so carefully arrived at and so well explained, as confirmed by the district court's compliment of the GAL. Here, the court failed to address all of the GAL's statements supporting her recommendation that were distinct from Child's wishes and rejected the recommendation because Child was only thirteen years old and, in the court's view, incapable of having any meaningful input that would allow it to give weight to her desires. The district court failed to address the GAL's determination that Child was intelligent, conversant, and

articulate, and failed to provide subsidiary facts or applicable law for its refusal to give weight to Child's desires.

¶40    The only factor provided by the GAL in support of her determination that Father should be awarded custody that the district court addressed was Child's academic future. The court explained that "it does not make best interest findings on one parent's ability to provide education unless everything else was equal."

¶41    It is most curious that the district court concluded that, in light of the parents' respective track records, Mother was better fit to take sole physical custody of Child. The court's findings do not elucidate this conclusion and instead went so far as to admonish Mother three times regarding her lack of attention to Child's medical needs and ordered her to comply with recommendations of physicians and therapists. *See Bartlett v. Bartlett*, 2015 UT App 2, ¶ 6, 342 P.3d 296. After these three admonitions, the court stated that it "does not minimize [Mother's] failure to follow through with medical needs of" her daughter but credited only Mother for Child's "continued therapy treatment." The record does not support this attribution.

¶42    In light of the district court's failure to provide sufficient detail to demonstrate a factual basis for the custody award, and its failure to adequately explain its departure from the GAL's recommendation, we vacate that award and remand the case for further proceedings, including supplementation of the court's findings and reconsideration of the custody award in light of those supplemented findings.[11] *See id.* ¶ 8. We do not intend our

---

11. Father also contends the district court abused its discretion in awarding Mother sole physical custody because the award was against the "manifest weight of the evidence presented at trial." "But because we rule that the findings of fact inadequately

(continued…)

remand to be merely an exercise in bolstering and supporting the conclusion already reached. *See Woodward v. Fazzio*, 823 P.2d 474, 479 (Utah Ct. App. 1991) (citation and internal quotation marks omitted). We are not altogether confident that the district court's final decision was correct, especially considering the number of times the court admonished Mother for not taking appropriate action with respect to Child's suicide attempts and further self-harming behavior. *See id.*

## II. The District Court's Failure to Rule on All Issues Certified for Trial

¶43 Father contends the district court failed to "rule on all issues certified for and presented at trial." "It is well settled that a court must make findings of fact on all material issues raised by the pleadings." *Cook v. Cook*, 174 P.2d 434, 435 (Utah 1946). In all actions tried upon the facts without a jury, "the court must find the facts specially and state separately its conclusions of law. The findings and conclusions must be made part of the record and may be stated in writing or orally following the close of the evidence. Judgment must be entered separately under Rule 58A." Utah R. Civ. P. 52(a)(1). Failure to rule on all material issues certified for trial is reversible error, *see Vandermeide v. Young*, 2013 UT App 31, ¶ 8, 296 P.3d 787, "unless the facts in the record are uncontroverted," *Interstate Income Props., Inc. v. La Jolla Loans, Inc.*, 2011 UT App 188, ¶ 13, 257 P.3d 1073.

---

(…continued)

disclose the steps by which the [district] court came to its conclusion, we need not reach this contention." *See Bartlett v. Bartlett*, 2015 UT App 2, ¶ 8 n.2, 342 P.3d 296. We stress, however, that we lack confidence in the district court's determination that the award of sole physical custody of Child to Mother was at all in Child's best interest.

¶44 Here, Father asserts that the issues of "child support; arrears on medical expenses; attorney's fees; and reallocation of the Custody Evaluator's fees, were [also] properly preserved at the [district] court," but the court did not rule on them. We agree.

¶45 In its findings of fact and conclusions of law, the district court found that "the following issues were certified for trial": custody, both legal and physical; parent-time; parenting plan issues; child support; arrears on medical expenses; attorney fees; and reallocation of the custody evaluator's fees. Evidence was presented throughout the trial, either through testimony or exhibits, as it related to the parties' respective income, Child's medical expenses, orders by the court awarding Father reasonable attorney fees, and allocation of the custody evaluator's fees. But there were no rulings on any of these issues.

¶46 Mother erroneously argues we are prohibited from reaching this issue under the doctrine of invited error. The doctrine of invited error prohibits litigants from inducing the district court "to make a ruling and then argue on appeal that the ruling was in error." *Zavala v. Zavala*, 2016 UT App 6, ¶ 21, 366 P.3d 422 (citation and internal quotation marks omitted). The purpose of the invited-error doctrine is to "discourage[] parties from intentionally misleading the [district] court so as to preserve a hidden ground for reversal on appeal and to give the [district] court the first opportunity to address the claim of error." *Id.* (first alteration in original) (citation and internal quotation marks omitted).

¶47 In the case now before us, Father filed a "Motion to Reconsider, or in the Alternative, Motion to Alter or Amend Findings of Fact and Conclusions of Law" under rule 52 of the Utah Rules of Civil Procedure. In the memorandum in support of the motion, Father notified the district court that it failed to rule on all of the issues certified for trial, identified the issues not

ruled upon, and asked the court to provide a ruling. Accordingly, Father, who called the error to the court's attention rather than inviting it, is not prohibited from making this argument on appeal. And because it is apparent from the record that the facts from the record are not uncontroverted, *see La Jolla Loans*, 2011 UT App 188, ¶ 13, we remand to the district court for failure to rule on all material issues certified for trial, *see Vandermeide*, 2013 UT App 31, ¶ 8, and to make an appropriate ruling on each question.[12]

## CONCLUSION

¶48 We conclude the district court failed to provide subsidiary facts to support its factual conclusions that led to its award of sole physical custody to Mother and failed to address the GAL's concerns about Mother being awarded sole physical custody or articulate the reasons for its departure from the GAL's recommendation. We also conclude the district court failed to address all material issues certified for and presented at trial. We therefore vacate the award of sole physical custody to Mother and remand the case for further proceedings to allow the district court to supplement the findings of fact and make the appropriate custody award in light of those supplemented findings.

---

12. *See supra* ¶ 42 & note 12.