2018 UT App 193

## THE UTAH COURT OF APPEALS

CRAIG HOSKING,
Appellee,
*v.*
ERIN JO CHAMBERS,
Appellant.

Opinion
No. 20160444-CA
Filed October 12, 2018

Second District Court, Ogden Department
The Honorable W. Brent West
No. 044901699

Jason B. Richards, Brandon R. Richards, and
Christopher Hill, Attorneys for Appellant

Troy L. Booher, Julie J. Nelson, and
Laura M. Rasmussen, Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

HARRIS, Judge:

¶1     After their divorce in 2008, Craig Hosking was ordered to pay alimony to Erin Jo Chambers. In 2012, suspecting that Chambers might be cohabiting with a new boyfriend, Hosking asked the district court to terminate his alimony obligation. After holding a two-day evidentiary hearing, the district court determined that Chambers was indeed cohabiting, and granted Hosking's petition. Chambers appeals, and asks us to consider two issues. First, she asserts that the district court's cohabitation determination was unsupported. Second, she contends that the district court failed to address certain other issues pertaining to the division of property in the decree of divorce. We affirm.

BACKGROUND

¶2     Because the two issues Chambers raises are grounded in different underlying facts, we set forth the facts relevant to each issue separately, in turn.

*Cohabitation*

¶3     Chambers and Hosking married in 1997 and divorced in 2008. As part of the decree of divorce, the court ordered Hosking to pay Chambers alimony of $8,000 per month for three years, then $7,000 per month for four additional years. Alimony would cease after seven years, or "upon the death of either party, or upon the re-marriage or co-habitation of [Chambers]."

¶4     In 2011, after making alimony payments for more than three years, Hosking ran across an obituary that described Chambers as the spouse of the deceased's brother. His interest piqued, Hosking hired two private investigators to determine whether Chambers was cohabiting. One of the private investigators surveilled Chambers and her boyfriend (Boyfriend) daily from August to November 2011, and again during late December 2011 and early January 2012. The other private investigator surveilled Chambers's Ogden residence daily for seventeen days in March 2012. In May 2012, after examining the results of the surveillance, Hosking filed a petition to terminate alimony, alleging that Chambers was cohabiting with Boyfriend.

¶5     In 2015, the court held a two-day evidentiary hearing to consider Hosking's petition. Hosking introduced testimony from the two private investigators, and also presented documentary evidence obtained during discovery from Chambers and from Boyfriend, including bank statements, credit card statements, insurance policies, and other financial records. The investigators testified that Boyfriend owned a condominium in Provo, and traveled often for work, but that he spent the majority of his non-traveling time at Chambers's residence in Ogden rather than at his condo in Provo.

¶6     The first investigator testified that, between late August and early November 2011, Boyfriend spent twenty-four nights at Chambers's residence and only fifteen nights in Provo. The investigator observed that Boyfriend traveled frequently for work and would return to the Ogden residence after traveling. He also observed that Boyfriend often drove three vehicles, each of which was regularly parked at the Ogden residence. Boyfriend drove one of those vehicles—later determined to belong to Chambers—not only to his job in Provo, but to the airport where he left it for several days while apparently on a trip to Hawaiʻi. The investigator also testified that Boyfriend stayed at the Ogden residence continuously from December 19 to 27, and again during the first weekend of January 2012. The investigator also testified that, during the entire period of surveillance, Boyfriend regularly attended church with Chambers in Ogden. He also observed that Boyfriend's parents took care of the Ogden residence while Chambers and Boyfriend were out of town. On a separate occasion, the investigator observed Chambers take care of a house owned by a member of Boyfriend's family.

¶7     The second investigator surveilled the Ogden residence for seventeen days in March 2012. He testified that he observed Boyfriend stay at the Ogden residence for thirteen of those nights, and that the house was empty the remaining four nights. He also testified that Boyfriend helped with yard work and household chores, and attended church with Chambers in Ogden. He testified that he observed the same three cars observed by the first investigator parked regularly at the Ogden residence, and that Boyfriend regularly drove all three cars. Moreover, he testified that two of these cars were registered to Chambers and Boyfriend jointly. He also testified that Boyfriend appeared to have independent access to the house, stating as follows: "He could come and go from the front door. He could come and go from the garage doors. He could come and go and leave the home at will. He didn't need help from anybody. Never knocked on a door. Never stood outside and made a phone call."

¶8      During this time period, Chambers was attempting to sell the residence, and the second investigator posed as a potential homebuyer in order to gain access to the interior of the house. While inside the house, the investigator observed men's clothing in the closet of the master bedroom that matched the type of clothing that he observed Boyfriend wearing during his surveillance. He also observed men's grooming products, including shaving cream and men's shampoo, in the master bathroom.

¶9      The financial records presented by Hosking indicated that Chambers and Boyfriend owned two vehicles together and held five joint insurance policies. In addition, the records demonstrated that Chambers and Boyfriend had a joint bank account and frequently transferred various sums of money to each other, including large amounts up to $30,000. The two had applied for a mortgage on the Ogden residence together, first in 2008, and again in 2012. On the 2008 application, Boyfriend listed his Provo address as his residence, but on the 2012 application he indicated that he had lived at the Ogden residence for a year.

¶10     Chambers and Boyfriend disputed Hosking's characterization of their living arrangements. Both testified that Boyfriend lacked independent access to the house, did not keep any clothes in the house, and did not meaningfully contribute to household expenses. Both testified that Boyfriend kept his Provo condo as his primary residence and only occupied the Ogden home infrequently and as a guest. Both testified that Boyfriend occasionally spent the night in Ogden because Chambers was afraid of the private investigators—whom Chambers and Boyfriend had noticed loitering near the residence—and that Boyfriend would often sleep in his car in front of the house. And both characterized the various transfers of money between themselves as loans with repayment obligations.

¶11     Chambers's mother testified at trial, acknowledging that Chambers and Boyfriend had a very close relationship, and that at the time of a pretrial deposition, she did not know whether Chambers and Boyfriend were married or not. Chambers herself

testified that she and Boyfriend became engaged in 2012 and remained so, but at the time of the 2015 hearing had not yet set a wedding date. Chambers admitted to having a sexual relationship with Boyfriend and frequently traveling with him. She also acknowledged that she and Boyfriend attended church and other family events together, and that she took care of Boyfriend's brother (the subject of the aforementioned obituary) as he suffered from terminal cancer.

¶12   Boyfriend testified that he spent a large amount of time in the Ogden area, not necessarily because of Chambers, but because most of his extended family lived in the area, his dentist and doctor were located there, and he had several business dealings in the area. He testified that he usually spent only "two or three nights a month" with Chambers, but acknowledged that his presence in Ogden increased after they became aware of the surveillance, because he was concerned about Chambers's welfare and worried that "there were people . . . harassing her and following her." Boyfriend also acknowledged that he was engaged to Chambers and that they had a very close relationship; indeed, he testified that he was "in love with her" and that she was his "main concern in this life."

¶13   After the two-day hearing, the district court concluded that Chambers and Boyfriend were cohabiting, and entered an order terminating Hosking's future alimony obligations. In addition, the court concluded that the cohabitation had begun "at least as of September 2011," and ordered Chambers to repay Hosking all of the alimony she received during the cohabitation. In reaching these conclusions, the district court found that Hosking's "witnesses and evidence [are] more credible than [Chambers's] witnesses and evidence," and that the explanations offered by Chambers and Boyfriend "are not consistent or credible." As a result of this credibility determination, the district court concluded that it would "resolve[] all inconsistencies in the evidence and therefore all disputed issues of fact in favor of [Hosking]."

*Procedural History of Allegedly Unresolved Issues*

¶14 The parties' original divorce decree, which was based on a stipulated settlement agreement, specifically addressed several items of personal marital property, including two aircraft, but stated that "[a]ll other items of personal property will be resolved separately," that "neither party has waived any claim or interest to any other personal property not covered herein," and that "all such claims are hereby reserved by the Court."

¶15 Following entry of the decree, the parties conducted discovery and negotiations for over a year regarding the remaining personal property items, before the district court held a one-day trial on the issue in July 2009. At that trial, after lengthy testimony regarding various items of personal property, Chambers attempted to raise an issue regarding an insurance payment deposited into a joint bank account while she and Hosking were still married. Hosking objected, on the ground that there was already an order regarding that money; Chambers conceded that such an order existed, but claimed she was now asserting that the money was a premarital asset and that the order was in error. The court stated that it "thought [the issue] was resolved" in earlier proceedings before the domestic relations commissioner and told the parties that they would "have to sort out what happened with the commissioner" and that the court would "reserve the issue for [the parties] to figure it out." The court took the remaining issues presented at the July 2009 trial under advisement.

¶16 On January 6, 2010, the district court issued a decision dividing the items of personal property addressed at the July 2009 trial. Soon thereafter, Hosking filed a "Request for Clarification of Court's 1/6/10 Decision and Request for Further Findings," asserting that the court had erred in its division of the personal property. The parties continued to litigate various issues involving the exchange of personal property through the end of 2011.

¶17   In February 2012, Chambers filed a "Notice of Issues Still Pending Before the Court," listing ten issues that Chambers believed to be still pending. In June 2012, the district court held a hearing on those issues, at which it heard arguments from both parties on each issue and concluded that it would "not re-open the divorce." The transcript of this hearing is not in the record on appeal. In September 2012, the court issued an order stating that eight of the ten issues Chambers raised "were merged into" the divorce decree, and "declin[ed] to re-open or proceed on those issues" in any manner. The court stated that it would retain continuing supervision over "[p]ayment of [Chambers's] portion of retirement accounts and [Chambers] taking [Hosking's] name off of the" Ogden residence, as already ordered in the divorce decree. And the court stated that it would retain continuing supervision, "as needed," over the parties' respective transfer of minor items of personal property (referred to as "[p]ots and [p]ans"), as previously ordered.

¶18   Chambers did not appeal the September 2012 order, but continued to file motions asking the court to address issues of personal property. Hosking had petitioned the court to terminate alimony by this time, and Chambers sought to address personal property issues as part of those proceedings. In March 2015, Chambers filed a document entitled "Respondent's Submission Regarding Pending Retirement and Personal Property Issues," which sought "final review" of certain issues that Chambers had previously raised in her February 2012 filing, including "[a]ssets that belonged to [Chambers's] children," Chambers's "premarital assets," "[f]ixtures in the family home," and "[a]ssets included earlier in the division of assets held within the California home." In her filing, Chambers gave no specific description of what these assets or fixtures were.

¶19   On May 12, 2015, the court held a telephonic hearing—separate from the upcoming evidentiary hearing regarding cohabitation—to discuss the scope of the personal property and retirement issues that remained to be addressed. No transcript of this hearing is in the record on appeal, but

the minutes of the hearing reflect that the court stated that it would "reconsider factual errors but not legal errors," and would not readdress issues regarding "California property" that had been "previously decided."

¶20    At the evidentiary hearing, the court primarily heard argument and testimony on the issue of cohabitation. There was also evidence given by two accountants regarding the correct present value of one of Hosking's retirement accounts. No argument or evidence was presented regarding any personal property, or of any factual errors the court may have made in earlier decisions regarding personal property.

ISSUES AND STANDARDS OF REVIEW

¶21    On appeal, Chambers first challenges the district court's cohabitation determination, arguing that its factual findings do not support its ultimate determination that cohabitation was present here. In her brief, Chambers appeared to be directly challenging some of the district court's underlying factual findings, but abandoned that position at oral argument, stating there that she was "accepting" the district court's underlying findings, but was challenging the court's ultimate determination that those findings add up to cohabitation.

¶22    A district court's "pure findings of fact" are "entitled to substantial deference on appeal," and are to be disturbed by an appellate court only if they are "clearly erroneous." *Myers v. Myers*, 2011 UT 65, ¶¶ 32, 34, 266 P.3d 806. Such findings of fact "entail the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind." *Id.* ¶ 32 (quotation simplified). In the cohabitation context, such "pure" findings include whether a sexual relationship exists between putative cohabitants, as well as "the degree to which they share[] space or expenses" in a household. *Id.* ¶ 37.

¶23    In the cohabitation arena, however, other determinations that a district court must make are findings "premised on embedded questions of law, which are reviewed for correctness." *Id.* ¶ 34. For instance, a district court's determination that two individuals do or do not have a shared residence is a "mixed question of law and fact" that involves "embedded legal conclusions that are reviewed for correctness on appeal." *Id.* ¶ 35. And the ultimate determination that two individuals are cohabiting is a "question[] of law on which no deference is due."[1] *Id.* ¶ 36 (stating that "the impact of common

---

1. In other similar contexts in which a district court is asked to make a determination regarding a mixed question of law and fact, Utah appellate courts afford district courts far more discretion than *Myers* permits in the cohabitation context. *See Myers v. Myers*, 2011 UT 65, ¶ 34, 266 P.3d 806. In other contexts, a district court's determination regarding mixed questions of law and fact is reviewed deferentially, because such determinations are "highly fact-dependent," and have "numerous potential fact patterns, which accords the trial judge a broad measure of discretion when applying the correct legal standard to the given set of facts." *See Judd v. Bowen*, 2018 UT 47, ¶ 8 (quotation simplified) (affording district courts discretion in determining whether "the legal standard for establishing a prescriptive easement" is met); *see also State ex rel. B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (stating that the ultimate decision about whether to terminate a parent's rights "presents a mixed question of law and fact," but that due to the "factually intense nature" of the analysis, a court's final decision regarding termination of parental rights "should be afforded a high degree of deference"); *State v. Pena*, 869 P.2d 932, 936–39 (Utah 1994) (stating that "the reasonable-suspicion legal standard is one that conveys a measure of discretion to the trial judge when applying that standard to a given set of facts"), *abrogation on other grounds recognized by USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 40 n.36 372 P.3d 629. While we wonder why our supreme court has prescribed a more restrictive standard of review for district court

(continued…)

residency and of a sexual relationship on the determination of cohabitation are questions of law on which no deference is due, since they do not call for proof but rather for argument" (quotation simplified)).

¶24    Next, Chambers "seeks a reversal of the [district] court's decision to refuse to address substantial personal property issues." This challenge is premised on the assumption that the trial court failed to address certain issues in this case. On this issue, Chambers "seeks a remand directing the trial court" to address the issues Chambers believes remain unaddressed. "It is the duty of the [district] court to find upon all material issues raised by the pleadings, and the failure to do so is reversible error." *K.P.S. v. E.J.P.*, 2018 UT App 5, ¶ 25, 414 P.3d 933.

ANALYSIS

I

¶25    The "ultimate inquiry" in any cohabitation case is whether there exists "a relationship akin to that existing between" a married couple. *Myers v. Myers*, 2011 UT 65, ¶ 17, 266 P.3d 806. Although the uniqueness of each individual marriage-like relationship precludes the development of a hard and fast set of elements comprising cohabitation, our supreme court has identified three general "hallmarks" of the sort of relationship that constitutes cohabitation: "a shared residence, an intimate relationship, and a common household involving shared expenses and shared decisions." *Id.* ¶ 24.

¶26    In this case, the district court determined that all three of these hallmarks were present in the relationship between

(…continued)
determinations in the cohabitation arena than in other similar contexts, we recognize that we are bound to follow *Myers*, and therefore apply the standard of review set forth there.

Chambers and Boyfriend, and from this determination concluded that Chambers and Boyfriend had a relationship akin to a married couple. On appeal, Chambers challenges the district court's determination regarding the existence of two of these hallmarks: (1) a shared residence, and (2) a common household involving shared expenses and shared decisions.[2]

A

¶27    A shared (or common) residence requires the "sharing of a common abode that both parties consider their principal domicile for more than a temporary or brief period of time." *Haddow v. Haddow*, 707 P.2d 669, 672 (Utah 1985). Cohabitation "implies continuity," and an individual's status as resident— rather than guest—is critical to a determination that a common residence exists. *Id.* at 673 (quotation simplified). Indeed, "a resident will come and go as he pleases in his own home, while a visitor, however regular and frequent, will schedule his visits to coincide with the presence of the person he is visiting." *Id.*

¶28    Here, the district court's unchallenged factual findings support the conclusion that Chambers and Boyfriend shared a common residence. In this case, unlike in *Haddow*, the court found that Boyfriend spent more time at the Ogden residence than he spent at any other residence, and that Chambers's residence was therefore his "primary residence." The district court based that finding on abundant evidence, including the investigators' testimony about Boyfriend's nightly whereabouts, as well as evidence that Boyfriend came and went from the house freely, received mail at the house, returned to the house when he came back from business trips, kept clothes at the house, kept his primary

---

2. As noted, Chambers does not challenge any of the district court's "pure" factual findings, including its finding—based largely on her own admission—that she and Boyfriend "shared an intimate or sexual relationship."

vehicles at the house, and asserted in a mortgage application that he resided there.

¶29    Chambers resists the district court's determination, arguing that the evidence relied upon by the district court failed to support the conclusion that Chambers and Boyfriend lived together for more than a temporary or brief period of time. We find this argument unpersuasive. In *Scott v. Scott*, 2016 UT App 31, 368 P.3d 133, *rev'd on other grounds*, 2017 UT 66, 423 P.3d 1275, this court noted that "temporary" refers to "the couple's state of mind—that is, whether moving in together is motivated or accompanied by a desire to operate as a couple for the foreseeable future or is simply an expedient arrangement with no enduring quality," while "brief" has to do with "the duration of the stay." *Id.* ¶ 22 (quotation simplified). There is no doubt that Chambers and Boyfriend envisioned a non-temporary arrangement; indeed, they were engaged to be married. And while we acknowledge that a longer surveillance period would give us a more comprehensive look at the relationship, we note that a court may consider even a short surveillance period to be "representative of a longer trend in the relationship." *See Levin v. Carlton-Levin*, 2014 UT App 3, ¶ 17, 318 P.3d 1177 (stating that a "fifty-two-day observation window" was long enough, because it was "representative of a longer trend in the relationship" and did not "constitut[e] the entirety of their relationship").

¶30    We therefore see no error in the court's determination that Chambers and Boyfriend enjoyed a common residence.

B

¶31    While both an intimate relationship and common residency are necessary conditions for cohabitation, they are not sufficient—either alone or in conjunction with each other—to establish the existence of the type of marriage-like relationship that defines cohabitation. *See Myers*, 2011 UT 65, ¶ 22 (finding a shared residence and sexual relationship insufficient to establish cohabitation when the relationship "bore little resemblance to a marriage" (quotation simplified)). To constitute cohabitation,

the relationship must also bear the hallmarks of "a common household in the sense of shared expenses, shared decision-making, shared space, or shared meals." *Id.* ¶¶ 23–24 (quotation simplified).

¶32   The district court's unchallenged factual findings provide ample support for its determination that Chambers and Boyfriend shared a common household. The district court specifically found that Chambers and Boyfriend "made many 'big ticket' decisions together, including numerous major financial decisions," and referenced their joint bank account, their joint ownership in vehicles which they jointly insured, their money transfers back and forth, and the fact that they twice jointly applied for a mortgage on the Ogden residence. The court also found that Chambers and Boyfriend "shared expenses in particular situations," would go shopping together, and would take at least some of their joint purchases to the Ogden house. The court also referenced the fact that the couple often vacationed together, attended church together, and had "extensive involvement in each other's extended families." The court also noted that Chambers's own mother, at the time of her deposition, did not know whether or not Chambers and Boyfriend were married, and that Boyfriend's brother's obituary listed Chambers as Boyfriend's spouse.

¶33   On this record, we discern no error in the district court's determination that Chambers and Boyfriend shared a common household. *See Levin*, 2014 UT App 3, ¶ 16 (affirming the district court's determination regarding common household where the couple shared meals, shared responsibility in care and upkeep of the home, shared in living expenses, and made major financial decisions together).

C

¶34   Much of the evidence in this case was contested, and it is certainly conceivable that a district court could have made different credibility determinations, and accordingly made factually-supported findings on many of the issues in favor of

Chambers and Boyfriend. But the district court in this case found Hosking's witnesses much more persuasive than Chambers's witnesses and, as a result, made a series of "pure" factual findings, all supported by competent (if contested) evidence, that comfortably support the conclusion that Chambers and Boyfriend were cohabiting.

¶35 As noted, the district court's ultimate "determination of cohabitation" is a question of law on which no deference is due. *See Myers*, 2011 UT 65, ¶ 36. But that determination was informed by amply-supported findings of fact, and we cannot perceive any error in the district court's ultimate conclusion. It is true that "there is no single prototype of marriage that all married couples conform to," *see id.* ¶ 24, but the relationship enjoyed by Chambers and Boyfriend, as characterized in the district court's unchallenged factual findings, has all of the hallmarks of a marriage-like relationship. We therefore affirm the district court's ultimate conclusion that Chambers and Boyfriend were cohabiting, and that they began cohabiting no later than September 2011.

II

¶36 In her second argument, Chambers "seeks a reversal of the [district] court's decision to refuse to address substantial personal property issues," and "seeks a remand directing the [district] court" to address the issues Chambers believes remain unaddressed. This argument fails for the simple reason that the district court did not fail to address the issues Chambers raises. The district court addressed the issues, but did so in a manner that Chambers did not like, namely, by determining that it had already dealt with them.

¶37 As noted above, the district court held a series of post-decree hearings and trials on various issues of personal property, issuing rulings in 2009 and 2010. Ultimately, in 2012, after Chambers kept filing motions asking for further relief, the court determined that all of the issues raised had already been decided in previous orders, or had been merged into the original

decree of divorce. In that order, the court offered to retain supervision, "as needed," over certain personal property rulings made in its January 2010 order, but in our view this statement did not constitute an admission that certain issues remained open for adjudication; rather, this statement indicated the court's willingness to supervise the parties, "as needed," in their implementation of orders already made.[3]

¶38    If Chambers thought that the district court was wrong in any of its findings or conclusions as set forth in that 2012 order, Chambers had the opportunity to take an appeal from that order. But she elected not to appeal that order, and

---

3. Neither in her briefing on appeal nor in her filings before the district court did Chambers set forth exactly what the issues are that she wanted the district court to address. In her appellate brief, she devotes just over one page to the entire issue, and never makes any meaningful effort to specify what particular issues were not addressed. As noted, she included a general description (e.g., "premarital assets," "fixtures") of these issues in one of her filings before the district court, but made no effort to specifically identify the items. In addition, she fails to include in the record on appeal a copy of the transcript of the May 12, 2015 telephone conference at which the district court discussed these issues, and made determinations about whether and to what extent these issues had already been addressed. Under these circumstances, Chambers has not carried her burden on appeal. *See Gines v. Edwards*, 2017 UT App 47, ¶ 21, 397 P.3d 612 (stating that "it is the appellant's burden to assemble, transmit, and perfect the record on appeal," and holding that, where the appellant had failed to provide a transcript of a relevant hearing, the appellant had failed to carry its burden of demonstrating district court error). Chambers's failure to provide a specific description of the issues she complains of, or a transcript of the relevant hearing, provides an independent basis for us to reject her second argument.

cannot do so now.[4] And to the extent that Chambers's 2015 filing was a motion asking the court to reconsider its previous rulings, we perceive no abuse of discretion in the district court's decision to decline such reconsideration. *See Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 15, 163 P.3d 615 (stating that district courts are

---

4. In her brief on appeal, Chambers gave no hint that she was attempting to appeal the September 2012 order; in her brief, her argument was that the district court failed to address the issues, not that it had addressed them in a previous order. At oral argument, however, Chambers appeared to change tactics to assert that she was indeed seeking to challenge the September 2012 order. To the extent that Chambers is asking us to review the district court's September 2012 order, this request suffers from two fatal infirmities. First, "[w]e do not address issues raised for the first time during oral argument." *Porenta v. Porenta*, 2017 UT 78, ¶ 33, 416 P.3d 487. Second, the time to appeal the 2012 order has long since expired. That order was a final order, because it purported to finally resolve the issues presented, and she had thirty days from the entry of that order to file a notice of appeal. *See* Utah R. App. P. 4(a); *see also America West Bank Members, L.C. v. State*, 2014 UT 49, ¶ 11, 342 P.3d 224 ("Our general rule in determining whether an order is final is whether the effect of the ruling is to finally resolve the issues." (quotation simplified)); *Cahoon v. Cahoon*, 641 P.2d 140, 142 (Utah 1982) (stating that orders enforcing a divorce decree "are independently subject to the test of finality, according to their own substance and effect"); *Ross v. Barnett*, 2018 UT App 179, ¶ 20 ("Where the effect of a postjudgment order is to determine substantial rights and end the litigation regarding a specific issue in a supplemental proceeding, the order will be a final order for purposes of appeal." (quotation simplified)). Her time to appeal that order expired in October 2012, and we are without jurisdiction to consider an appeal from that order now. *See Express Recovery Services, Inc. v. Wall*, 2012 UT App 138, ¶ 2, 278 P.3d 628 (per curiam) ("If an appeal is not timely filed, this court lacks jurisdiction to hear the appeal." (quotation simplified)).

"under no obligation to consider motions for reconsideration," and that a court's "decision to address or not to address the merits of such a motion is highly discretionary" (quotation simplified)).

CONCLUSION

¶39   The district court committed no error in concluding, based on its amply-supported factual findings, that Chambers and Boyfriend were cohabiting. And Chambers's second argument is without merit, because the district court did address the issues Chambers raises, just not in a manner Chambers liked. Accordingly, we affirm.

––––––––––